**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **ROBERTO VÁZQUEZ-RAMOS; IRMA L. RIVERA-RAMOS; THE VÁZQUEZ-RIVERA CONJUGAL PARTNERSHIP; JAVIER E. COLÓN-IRIZARRY; ADVANCED UROLOGY GROUP, LLC; LUIS M. MUÑIZ-COLÓN; WEST UROLOGY GROUP, PSC; JUAN M. COLÓN-RIVERA; CARIBBEAN UROCENTRE, CSP** | **CIVIL NO.** |
| Plaintiffs | ANTITRUST |
| V.S. | (JURY TRIAL IS REQUESTED) |
| **TRIPLE-S SALUD, INC.; HÉCTOR RODRÍGUEZ-BLÁZQUEZ; UROLOGICS, LLC; MSO OF PUERTO RICO, LLC; ABC INSURANCE; JOHN DOE** | |
| Defendants | |

# COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW** plaintiff, through the undersigned attorneys and very respectfully

**SETS FORTH** and **PRAYS**:

## I. JURISDICTION AND VENUE

1.1.    This Honorable Court has jurisdiction over the instant action pursuant to

28 U.S.C. § 1331 for 28 U.S.C. § 1337(a) over the foregoing claims seeking declaratory and

injunctive relief for violations of the Sherman Act, 15 U.S.C. § 1, et seq.  Supplemental

jurisdiction is sought pursuant to 28 U.S.C. § 1367 for claims arising under the Puerto

Rico antitrust legislation, 10 P.R. Laws Ann. § 257, et seq., as well as for claims under Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5141-5142.

1.2.    The District of Puerto Rico is the proper venue to hear this case, as per 28 U.S.C. § 1391(b)(2), as all of the relevant events occurred within the territorial limits of the Commonwealth of Puerto Rico.

## II.    THE PARTIES

2.1.    Plaintiff Roberto Vázquez-Ramos is a licensed physician and a board-certified urologist who is authorized to engage in the practice of medical urology in Puerto Rico.  His main office is located in the City of Aguadilla, Puerto Rico.

2.2.    Plaintiff Irma Luz Rivera-Ramos is plaintiff Vázquez-Ramos' wife and they are married under the economic regime known under Puerto Rico law as a conjugal partnership, which is charged with the administration of all assets and liabilities acquired during their marriage.

2.3.    Plaintiff the Vázquez-Rivera Conjugal Partnership is the legal entity generated upon plaintiffs Vázquez-Ramos and Rivera-Ramos' marriage.

2.4.    Plaintiff Javier E. Colón-Irizarry is a licensed physician and a board-certified urologist who is authorized to engage in the practice of medical urology in Puerto Rico.  His main office is located in the City of Mayagüez, Puerto Rico.

2.5.    Plaintiff Advanced Urology Group, LLC is a, for-profit, domestic legal entity created on 2015 for which plaintiff Colón-Irizarry performs a portion of his professional work.  This entity's main offices are located in the City of Mayagüez, Puerto Rico.

2.6.    Plaintiff Luis Manuel Muñiz-Colón is a licensed physician and a board-certified urologist who is authorized to engage in the practice of medical urology in Puerto Rico.  His main office is located in the City of San Germán, Puerto Rico.

2.7.    Plaintiff West Urology Group, PSC is a, for-profit, domestic professional services corporation chartered in 2014 for which plaintiff Muñiz-Colón performs a portion of his professional work.  This entity's main offices are located in the City of San Germán, Puerto Rico.

2.8.    Plaintiff Juan M. Colón-Rivera is a licensed physician and a board-qualified urologist who is authorized to engage in the practice of medical urology in Puerto Rico.  His main office is located in the City of Mayagüez, Puerto Rico.  This plaintiff's claim is limited to co-defendant MSO of Puerto Rico, Inc.  Hence, when we refer to "plaintiffs" in the context of the claims asserted against the other defendants, such statement excludes this plaintiff.

2.9.    Plaintiff Caribbean Urocentre, CSP is a, for-profit, domestic professional services corporation chartered in 2006 for which plaintiff Colón-Rivera performs a portion of his professional work.  This entity's main offices are located in the City of Mayagüez, Puerto Rico.  This plaintiff's claim is limited to co-defendant MSO of Puerto Rico, Inc.  Hence, when we refer to "plaintiffs" in the context of the claims asserted against the other defendants, such statement excludes this plaintiff.

2.10.   Defendant Triple-S Salud, Inc., is a, for-profit, domestic corporation chartered in 2012 that is engaged in the business of health insurance in Puerto Rico.  Its main offices are located in San Juan, Puerto Rico.

2.11.    Defendant Héctor M. Rodríguez-Blázquez is a licensed physician and a board-certified urologist who is authorized to engage in the practice of medical urology in Puerto Rico.  His main office is located in the City of Mayagüez, Puerto Rico.

2.12.    Defendant Urologics, LLC, is a, for profit, domestic legal entity that is wholly or largely owned by co-defendant Rodríguez-Blázquez, which is engaged in the business of providing medical urology services.  Its main offices are located in the City of Mayagüez, Puerto Rico[1].

2.13.    Defendant MSO of Puerto Rico, LLC, is a domestic limited liability company that is engaged in the administration of Medicare Advantage health insurance, specifically with "*Medicare y Mucho Más*" and "Preferred Medical Card" (hereinafter referred to as "MMM" and "PMC", respectively).

2.14.    Defendant ABC Insurance Company is a legal entity whose actual name is not yet known that may be liable for the damages proximately caused by one or more of the defendants.

2.15.    Defendant John Doe is a natural person or legal entity whose name is not yet known that participated with the named defendants in their refusal to deal practices or otherwise conspired with them to engage in violations of federal and Puerto Rico antitrust law.

---

[1] The main offices are located in Mayagüez, but it should be noted that but for Dr. Rodríguez-Blázquez, all other urologists belonging to the group are located in the cities of Arecibo and Ponce, wherein said physicians practice medicine.

### III.    THE FACTS

3.1.    Ever since Puerto Rico was allowed a charter for self-governance under the 1900 and 1917 organic acts, health services to citizens of limited financial means was provided by the local government is publicly owned facilities wherein physicians employed and/or retained under contract by the local authorities tended to said population's health concerns[2].

3.2.    In the year 1993, a major overhaul of the Puerto Rico public healthcare system was performed by means of Act Number 72 of September 7, 1993, 24 P.R. Laws Ann. § 7001, et seq., which has since been amended on multiple occasions.

3.3.    The largest paradigm shift brought about by the 1993 reform (which was later rebranded as "*Mi Salud*" medical insurance plan[3]) was the privatization of most public health facilities and the creating of a public healthcare insurance scheme similar to that used in the private sector that would be funded mostly through Medicaid grants and funds collected from the Commonwealth and the municipal governments[4].

3.4.    Upon the approval and implementation of the healthcare reform, the population that qualified for coverage was split into 8 geographic regions[5] in which

---

[2] The network of public health facilities spread throughout Puerto Rico, as well as the method for administering such facilities is commonly known as the "Arbona System", in reference to its primary architect, Dr. Guillermo Arbona-Irizarry (1910-2002).

[3] Even more recently, this program has been rebranded as "Vital". Since "Mi Salud" was the moniker in effect while most of the most relevant facts occurred, we shall use it as the preferred designation.

[4] The formula for determining how much money the Commonwealth and municipal governments must put into the program is determined by statute. In addition, the program has historically received funds from special appropriations made by Congress, as well as from the proceeds of municipal bonds issued for such purposes.

[5] The map drawn to designate these regions has not suffered any significant changes since the reform was instituted in 1993.

private health care providers formed independent practice associations that each handled a number of patients.

3.5.    The statute created a public entity (separate from the Commonwealth government itself) known as Health Insurance Administration of Puerto Rico (hereinafter referred to as "ASES" for its Spanish language acronym), which in turn entered into contracts with private health insurance companies for the delivery of the services required under the program.

3.6.    The insurance companies are responsible for retaining the healthcare providers that are necessary to provide the requisite services requires by the population in the region that they serve[6].

3.7.    Also relevant to the instant action is the Medicare Advantage Program (also known as "Medigap Insurance" or "Medigap Coverage"[7]) and, as such, is restricted to patients who qualify for benefits under the Medicare Act (i.e., Title XVIII of the Social Security Act), 42 U.S.C. § 1395, et seq.  In other words, this is a medical insurance program that is essentially available only to retirees that, throughout their productive years, made the requisite payments into the Medicare Program.

3.8.    As recently explained by the Eleventh Circuit:

> Medicare Advantage is a modern adaptation of the momentous 1960s-era program. Traditional Medicare uses a fee-for-service payment model, whereby the more services physicians perform, the more money they earn. After Medicare was enacted, however, experts came to realize that this payment structure encourages healthcare providers to order more tests and

---

[6] While Act 72-1993 does allow for health providers to contract directly with ASES, such scheme has not been used with regards to what is relevant here: the provision of urology services in the Western Region of Puerto Rico.

[7] See https://boomerbenefits.com/medicare-advantage/what-is-medicare-advantage/.

procedures than medically necessary. <u>See</u> Thomas L. Greaney, <u>Medicare Advantage, Accountable Care Organizations, and Traditional Medicare: Synchronization or Collision?</u>, 15 Yale J. Health Pol'y, L. & Ethics 37, 38, 41 (2015).

Medicare Advantage seeks to improve the quality of care while safeguarding the public fisc by employing a "capitation" payment system. Capitation means an amount is paid per person. Capitation, Black's Law Dictionary (10th ed. 2014). Under Medicare Advantage's capitation system, private health insurance organizations provide Medicare benefits in exchange for a fixed monthly fee per person enrolled in the program— regardless of actual healthcare usage. These organizations pocket for themselves or pay out to their enrollees' providers the difference between their capitation revenue and their enrollees' medical expenses, creating an incentive for the organizations to rein in costs.

<u>United States ex rel. Silingo v. Wellpoint, Inc.</u>, 904 F.3d 667, 672 (11ᵗʰ Cir. 2018)

3.9.    One of the largest Medicare Advantage providers in Puerto Rico is MMM, whose physicians are retained by and are under contract with co-defendant MSO of Puerto Rico, LLC (hereinafter referred to as "MSO").

3.10.    As of the end of May of 2015, plaintiffs Vázquez-Ramos, Colón-Rivera and Caribbean Urocentre, CSP were, by virtue of a contract with MSO, MMM/PMC providers of urology services to qualified western region participants enrolled with said insurer.

3.11.    At all times relevant to this action, Triple-S Salud, Inc. (hereinafter referred to as "Triple-S") has been the private health insurance provider retained by ASES to provide services for over 200,000 patients in the Western Region of Puerto Rico.

3.12.    Up until the summer of 2015, all plaintiffs were under contract with Triple-S to provide medical urology services in the Western Region which, due to their

respective strategic locations throughout the area, efficiently served the qualified population[8].

3.13.   Moreover, the availability of more than one medical urology provider guaranteed the patients' statutory right (24 P.R. Laws Ann. § 7036a(3)(h)) to freely select his/her provider.

3.14.   On or around the beginning of the year 2015, unbeknown to plaintiffs, defendants Triple-S and Rodríguez-Blázquez began conversations aimed at having the latter become the sole and exclusive provider of urology services for *Mi Salud* patients in Western Puerto Rico, as well as engaging in conversations with MSO to concoct a similar monopolistic arrangement for MMM/PMC patients.

3.15.   The clear objective of the defendants was to create a monopoly in the provision of urology services to the substantial *Mi Salud* and MMM/PMC medical population in Western Puerto Rico.

3.16.   By refusing to deal with plaintiffs (by not renewing their contracts) and other qualified medical providers, Triple-S was in fact eliminating any competition between urologists within the *Mi Salud* population, which constitutes an unlawful boycott under antitrust law.

3.17.   Defendant Rodríguez-Blázquez gladly acquiesced to Triple-S's and MSO's monopolistic proposals, using Urologics, LLC (hereinafter referred to as "Urologics") as

---

[8] It should be noted that co-plaintiffs Vázquez-Ramos and Colón-Rivera rendered services to patients under government insurance, without interruption, for over 15 years prior to the actions challenged in the instant complaint.

a front and an *alter ego*, as there is little, if any, distinction regarding where the natural person ends and the legal entity begins.

3.18.   This new scheme of limiting urology services for *Mi Salud* patients in Western Puerto Rico, while highly prejudicial to the over 200,000 souls that cannot afford private health insurance, served defendants' economic interests just fine.

3.19.   In the case of Triple-S, the one-provider model made it more difficult for patients to obtain urology services, thereby decreasing the amount of consultations and medical procedures that the insurance carrier has to pay for in any given year, not to mention that defendants negotiated certain discounts in favor of Triple-S, on account of the exclusive provider status that was being granted.

3.20.   Moreover, the agreement between Triple S and Urologics included a clause providing that after October 1, 2015, any savings on certain urologic proceedings would be split in equal parts between them.

3.21.   Plaintiffs have learned that since defendants entered into their monopolistic arrangement, the number of prostate cancer patients treated by Rodríguez-Blázquez/Urologics that have been physically castrated in lieu of more effective, albeit more expensive, drug treatment has skyrocketed resulting in an inferior quality of life for these patients and in more money in defendants' bank accounts.

3.22.   Along the line of urologic procedures, not only did Triple S and MSO grant Rodríguez-Blázquez/Urologics regional exclusivity over urology consultations but it also granted said parties, exclusivity over lithotripsy procedures, ceasing referrals to plaintiffs for such endeavors and thus saddling them with a substantial loss of income.

3.23.   In the case of Rodríguez-Blázquez and Urologics, the monopolistic exclusion of other provider eliminated their competition within the region's *Mi Salud* population creating a business environment in which billing services to said population became the proverbial "shooting fish in a barrel".

3.24.   As shall be explained in finer detail further into the foregoing document, Urologics never had the capacity to adequately care for the urologic health of the 200,000+ souls that live in the Western area of Puerto Rico and have been placed in its exclusive care, something that became apparent when plaintiffs and other urology providers were ousted.

3.25.   On March 2015 (a time in which defendants' conspiracy to violate antitrust law was in full swing), plaintiffs received a letter from Triple-S advising them that the insurance company had entered into a new contract with ASES (for the administration of *Mi Salud* in regions Metro-North and West), effective April 1, 2015 and advising that, if by May 31, 2015 a new contract had not been signed with Triple-S, plaintiffs would become "non-participating providers".

3.26.   Since defendants were in the midst of organizing their exclusive provider scheme during the time after the letter referred to in the previous paragraph was sent, plaintiffs were never approached with any offer for renewal or any invitation to engage in renewal negotiations, notwithstanding their repeated efforts to engage in such negotiations with Triple S.

3.27.   By means of a two-sentence letter dated May 29, 2015, Triple-S informed plaintiffs would have their contracts extended for services rendered up until July 31, 2015.

3.28.   Plaintiffs have, on multiples occasions (several of them, in writing) unsuccessfully sought to have Triple-S and MSO once again retain them as urology providers.

3.29.   During most, if not all, of the period during which Urologics has been the exclusive urology provider for the western region's patients, Dr. Rodríguez-Blázquez has been the only urologist in said group with offices within the region.

3.30.   While the region includes towns as far away from each other as, for example, Aguadilla and San Germán, when the exclusive provider deal was first entered into, Rodríguez-Blázquez only enjoyed clinical hospital privileges in the tiny Dr. Perea Pavía Hospital in downtown Mayagüez, which on more than one occasion required plaintiffs to, notwithstanding their non-participating provider status, treat patients with emergency urological conditions in different hospitals throughout the region billing Triple-S under special emergency invoices, if at all.

3.31.   Early into the exclusivity deal, Rodríguez-Blázquez was granted clinical privileges at the Mayagüez Medical Center (hereinafter referred to as "MMC"), which he has handled quite unprofessionally, in detriment of the patients that he is supposed to serve.

3.32.   The MMC's administration has repeatedly complained to Rodríguez-Blázquez for, *inter alia*: 1) his refusal to go to the hospital to examine hospitalized patients, as well as patients in the emergency room, resorting to instead issue medical orders via telephone (without having ever seen the patient); sending non-medical staff to examine patients, ordering the discharge of unexamined patients or ordering them transferred to

Dr. Perea Hospital; 2) refusing to answer urology consultations logged in by other members of the hospital's staff; 3) refusing to report to the operating room to tend to consultations made by other physicians regarding patients undergoing surgery; and 4) failing to attend compulsory medical staff meetings.

3.33.   Rodríguez-Blázquez' response to MMC's demands for basic professional competence has been met with demands that the hospital manage its urology consultations the way that he deems proper or otherwise refer the patients to the Dr. Perea Hospital.

3.34.   During a meeting on September 2016, Rodríguez-Blázquez told MMC officials that he would start to properly take care of the hospital's urology patients once he managed to have another urologist join Urologics, referring to his ongoing efforts to incorporate plaintiffs into his monopolistic juggernaut.

3.35.   In true monopolistic fashion, Rodríguez-Blázquez engaged in particularly overt oral and written attempts to recruit plaintiff Javier Colón-Irizarry into Urologics so that he would perform the work at MMC that said party was unable and/or unwilling to do.

3.36.   In the case of plaintiff Muñiz-Colón, Urologics listed him (without his knowledge or consent) in official documents as a contractor, in order to give the appearance that it was sufficiently staffed to handle the *Mi Salud* population of the region.

3.37.   The situation described in the preceding paragraphs has been brought before Triple-S's attention on multiple occasions by MMC's management, prompting no response, as limiting competition among *Mi Salud* providers (and the economic benefit

that such conduct engenders) seems to be more important to this defendant than ensuring that its insured population received acceptable urology services.

3.38.   By letter dated March 28, 2017, Kermit Ortiz-Morales, Esq., legal advisor to MMC informed Triple-S's President, Madeline Hernández-Urquiza about Rodríguez-Blázquez' behavior, its adverse effect on *Mi Salud* patients treated at the hospital and the efforts made by management to secure compliance from this physician and/or Urologics, ending with a plea that is directly related to monopolistic practices, to the effect that:

> In attention to what has been previously stated, through the foregoing, MMC requests from Triple-S the immediate cancelation of the exclusive provider contract that it maintains with Urologics for the provision of urology, urologic surgery and lithotripsy in Puerto Rico's Western Health Region and, consequently proceed to directly  enter into contracts with other surgeons/urologists that have clinical privileges in the hospital and that reside within the Western Health Region, for the provision of medical/hospital services; without prejudice of Triple-S being able to grant Urologics, as it deems proper, any other similar contract for the provision of medical services in the relevant fields of medicine, so long as such contract not be an exclusive one.  (emphasis in the original; translation ours[9])

3.39.   Needless to say, defendants' monopolistic behavior has resulted in substantial economic losses for plaintiffs herein, as they have been unable to provide their services to members of the *Mi Salud* population in the Western Health Region.

3.40.   Dr. Rodríguez-Blázquez and Urologics were not content with creating a regional monopoly of *Mi Salud* patients in Western Puerto Rico but it further sought to obtain such regional exclusivity with regards to MMM Medicare Advantage patients.

---

[9] Needless to say, if and when the letter is filed with the Court or introduced into evidence in a hearing, the same will be accompanied by a certified translation thereof.

3.41.   Just as in the case of Triple S, MSO was happy to oblige and give into the monopolistic pretensions of Rodríguez-Blázquez/Urologics, to the detriment of other qualified providers whose contracts were cancelled, including plaintiffs Vázquez-Ramos, Colón-Rivera and Caribbean Urocentre, CSP.

3.42.   The reasons why MSO and Rodríguez-Blázquez/Urologics entered into a monopolistic arrangement are essentially the same that we have previously averred with regards to the regional monopoly concocted by the latter and co-defendant Triple S with regards to *Mi Salud* patients.

3.43.   Plaintiffs' economic losses, based on prior billing to Triple-S, since July 2015 up until today, are estimated in no less than $1,000,000.00 per provider[10], an amount that continues to increase as time goes by.  This figure holds true both for loses attributable to collusion with Triple S and those attributable to collusion with MSO by the two plaintiffs asserting claims against said co-defendant.

3.44.   The damages referred to in the previous paragraph constitute "antitrust injuries" as defined by the Supreme Court, as they are directly linked to defendants' actions eliminating any competition whatsoever in the provision of urology services to *Mi Salud* patients in western Puerto Rico, which effectively prevented them from participating in said market.  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489-490 (1977).

---

[10] The final, accurate figure can only be determined through the examination of materials that will be obtained through discovery and will reflect the actual amount of professional work that plaintiffs were precluded from engaging in because of defendants' collusive behavior.

3.45.    Additionally, the illegal exclusion of plaintiffs as qualified urology providers has generated in them profound feelings of anger, anxiety (because the sudden and substantial loss of income), frustration and sadness that are actionable under Puerto Rico tort law and are estimated at no less than $500,000.00 for each individual[11] plaintiff.

## IV.    FIRST CAUSE OF ACTION (Sherman Act)

4.1.    The Sherman Act allows persons injured to file suit seeking relief in federal court including suits for treble damages, prejudgment interest, injunctive relief and attorney's fees.  See 15 U.S.C. §§ 4; 15.

4.2.    While there are valid business reasons why a person or entity may refuse to deal with others engaged in the same industry, where said refusal is fueled by a desire to limit competition, it violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1; 2.

4.3.    In our Circuit, a violation of Section 2 of the Sherman Act lies where: 1) the defendant possesses monopoly power in the relevant market; and 2) has willfully acquired or maintained that power by means other than a superior product, business acumen or historic accident.  Díaz Aviation Corp. v. Airport Aviation Services, 716 F.3d 256, 265 (1st Cir. 2013), accord United States v. Grinnell Corp., 384 U.S. 563, 570-571 (1966)

4.4.    Triple-S possesses the authority to create a monopoly in the provision of urology services to *Mi Salud* patients in Western Puerto Rico and has in fact awarded such a monopoly to wholly-underqualified defendants Rodríguez-Blázquez and Urologics, a willful action that was motivated solely by a desire to increase defendants'

---

[11] Obviously, the corporate plaintiffs cannot and are not claiming any damages for pain and suffering.

profits.   The same holds true for MSO in the context of MMM Medicare Advantage patients.

4.5.    Exclusive dealing, such as the one at play in the instant case, may be a per se violation of Section 1 of the Sherman Act or if it is found to impair competition when assessed under the so-called "rule of reason".  <u>Tampa Elec. v. Nashville Coal Co.</u>, 365 U.S. 320, 333-335 (1961); <u>United States Healthcare, Inc. v. Healthsource, Inc.</u>, 986 F.2d 589, 595 (1st Cir. 1993), both of which may be concluded from the facts of this case.

4.6.    Section 1 of the Sherman Act further proscribes any conspiracy that results in the constraint of trade.

4.7.    It is undeniable that defendants have colluded to exclude plaintiffs from participation in the *Mi Salud* market solely for purposes of increasing their profits on account of their refusal to deal with plaintiffs.

4.8.    Plaintiffs are entitled to injunctive relief in the form of an order requiring Triple-S and MSO to break the monopoly created in favor of Rodríguez-Blázquez/Urologics, an award of treble damages, prejudgment interest and reasonable attorney's fees, to be assessed under a lodestar calculation.

## V.     SECOND CAUSE OF ACTION (Puerto Rico Antitrust Law)

5.1.    Just like the Sherman Act, the Puerto Rico Antitrust Act allows private parties aggrieved by proscribed conduct to seek judicial redress.  10 P.R. Laws Ann. § 268.

5.2.    The Puerto Rico Antitrust Act, pretty much adopts the language contained in the Sherman Act that is relevant to the claims being asserted herein and thus, proscribe

the same conduct.  <u>See</u> 10 P.R. Laws Ann. §§ 258-262; <u>Podiatrist Ass'n v. La Cruz Azul de P.R., Inc.</u>, 332 F.3d 6, 16 (1ˢᵗ Cir. 2003); <u>Coastal Fuels Inc. v. Caribbean Petroleum Corp.</u>, 79 F.3d 182, 195 (1ˢᵗ Cir. 1996).

5.3.    Based on the parallels between the Sherman Act and the Puerto Rico legislation, the same facts that constitute a federal violation also constitute a violation of local law and need not be repeated here.

5.4.    Just as is the case under the Sherman Act, defendants' violations of the Puerto Rico Antitrust Act entitle plaintiffs to injunctive relief to stop the offending conduct, as well as to treble damages.

## VI.    THIRD CAUSE OF ACTION (Puerto Rico Tort Law)

6.1.    Article 1802 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5141, provides for the allowance of compensatory damages in favor of any person that is injured through the intentional or negligent acts of a third party.

6.2.    In order to obtain relief under this statute, a plaintiff has to establish the existence of "(i) a compensable injury; (ii) a wrongful act on the defendant's part; and (iii) a sufficiently tight causal nexus between the injury and the wrong".  <u>González Figueroa v. J.C. Penney P.R., Inc.</u>, 568 F.3d 313, 319 (1ˢᵗ Cir. 2009) (citing Puerto Rico Supreme Court precedent).

6.3.    Article 1803 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5142, provides for the imposition of vicarious liability for the tortious conduct of a person's/entity's employees and/or agents, something that is highly relevant in the context of the claims asserted against the above-captioned corporate defendants.

17

6.4.     Without the shadow of a doubt, the same actions incurred in by the defendants in violation of federal and local antitrust legislation also constitute a tort under Puerto Rico law.

6.5.     Nothing precludes a federal antitrust plaintiff for invoking supplemental jurisdiction over derivative state tort claims.

## VII.    JURY DEMAND

7.1.     Plaintiffs demand their Seventh Amendment to a jury trial on all claims so triable.

**WHEREFORE** it is respectfully requested from this Honorable Court that the relief requested in the foregoing action be hereby **GRANTED**.

In San Juan, Puerto Rico this 30th day of May, 2019.

**RESPECTFULLY SUBMITTED**,

**M.L. & R.E. LAW FIRM**
513 Juan J. Jiménez St.
San Juan, Puerto Rico 00918
Tel (787) 999-2979
Fax (787) 758-2221

*S/Jorge Martínez Luciano*
**JORGE MARTINEZ LUCIANO**
USDC-PR Number 216312
e-mail: jorge@mlrelaw.com

*S/Emil Rodríguez Escudero*
**EMIL RODRÍGUEZ ESCUDERO**
USDC-PR Number 224312
e-mail: emil@mlrelaw.com